| | | |
|---|---|---|
| 12/97 | 12/18/97 | plaintiff's |
| 1/98 | 2/9/98 | defendant's |
| 2/98 | 2/23/98 | plaintiff's |

**Permanent Lease**

| | | |
|---|---|---|
| 3/98 | 4/15/98 | defendant's |
| 4/98 | 5/18/98 | defendant's |
| 5/98 | 5/27/98 | plaintiff's |

6/11/98—Dispute Began

| | | |
|---|---|---|
| 6/98 | 6/12/98 | plaintiff's |
| 7/98 | 8/6/98 | defendant's |
| 8/98 | 9/25/98 | defendant's |
| 9/98 | 10/16/98 | defendant's |
| 10/98/ | 10/28/98 | plaintiff's |
| 11/98 | 12/9/98 | defendant's |
| 12/98 | 12/29/98 | plaintiff's |
| 1/99 | 2/4/99 | defendant's |
| 2/99 | 2/24/99 | plaintiff's |
| 3/99 | 3/26/99 | plaintiff's |
| 4/99 | 4/30/99 | plaintiff's |
| 5/99 | 5/25/99 | plaintiff's |
| 6/99 | 6/25/99 | plaintiff's |
| 7/99 | 7/22/99 | plaintiff's |
| 8/99 | 8/25/99 | plaintiff's |
| 9/99 | 9/20/99 | plaintiff's |

## SUCESION J. SERRALLES, INC., Plaintiff,

### v.

## The UNITED STATES, Defendant.

### No. 96–164C.

United States Court of Federal Claims.

June 5, 2000.

John W. Van Horne, Washington, D.C., for plaintiff.

Dominique Kirchner, Washington, D.C., with whom was Acting Assistant Attorney General David W. Ogden, for defendant.

## OPINION

LYDON, Senior Judge.

This case, brought under the Contract Disputes Act of 1978 (41 U.S.C. § 601, *et seq.*), is before the court on motions for summary judgment. Plaintiff, Sucesion J. Serralles, Inc., seeks damages in the principal amount of $478,417.85 based on the alleged failure of defendant, the U.S. Army Corps of Engineers, to "aesthetically dress" plaintiff's land from which clay was excavated for use in building the Cerrillos Dam near Ponce, in south-central Puerto Rico. Plaintiff asserts that defendant was contractually obligated to spread unused material from the excavation site, rather than leave it piled up, and that defendant is therefore liable for the cost of restoring the land to a usable condition. Oral argument was held on December 23, 1997, and on April 4, 2000. For the reasons set forth below, the court denies plaintiff's motion for summary judgment and grants defendant's cross-motion for summary judgment.

### FACTS

Under Section 201 of the Rivers and Harbors Flood Control Act of 1970, Public Law 91–611, 84 Stat. 1818, approved December 31, 1970, the U.S. Army Corps of Engineers was authorized to expend federal funds for various flood control projects on the Portuguese and Bucana Rivers near Ponce, in south-central Puerto Rico. These projects included the construction of a dam and reservoir on the Cerrillos River, a tributary of the Bucana. The authorization (in the estimated amount of $16,351,000 for the Cerrillos Dam and Reservoir and $25,405,000 for the other projects) was made "substantially in accordance with the recommendations of the Chief of Engineers in House Document Numbered 91–422."[1] Among the recommendations in the House Document were that local authorities in Puerto Rico "be required to .... provide all lands, easements, rights-of-way, and relocations required for the project," as well as "hold and save the United States free from damages due to construction, maintenance, and operation of the project." House Document Numbered 91–422, Report of the Chief of Engineers, p. 74. Thus, while the United States furnished the funding for the flood control projects, Puerto Rico was responsible for securing access to the project area(s) and insulating the United States from any and all damages claims.

Pursuant to this federal legislation, the United States and the Commonwealth of Puerto Rico entered into a Local Cooperative Agreement on June 11, 1974 for channel improvements on the Portuguese and Bucana

---

1. House Document Numbered 91–422, dated December 2, 1970 and referred to the Committee on Public Works, was a letter from the Secretary of the Army to Congress transmitting a letter and report to him dated October 2, 1970 from the Chief of Engineers, Department of the Army, on the subject of flood control and other projects on the Portuguese and Bucana Rivers in Puerto Rico.

Rivers. Seven years later, on April 28, 1981, the United States and Puerto Rico entered into another Local Cooperative Agreement for the construction of the Cerrillos Dam and Reservoir. Consistent with the recommendations of the Rivers and Harbors Flood Control Act of 1970, the 1981 Agreement provided that the United States "shall commence construction of the Cerrillos [Dam and] Reservoir" and Puerto Rico "shall, in consideration [thereof], fulfill the requirements of non-Federal cooperation specified in such legislation...." These requirements included, among others, "(a) [to] provide all lands, easements, rights-of-way, and relocations required for the Project" and "(b) [to] hold and save the United States free from damages due to the construction, maintenance, and operation of the Project except damages due to the fault or negligence of the United States or its contractors."

The Cerrillos Dam was to be an earthen structure, requiring clay material for the inner core. To identify clay suitable for use in the dam, the U.S. Army Corps of Engineers (ACE) entered into an agreement in 1980 with Sucesion J. Serralles, Inc. (Serralles) to excavate a test pit in the clay borrow area owned by Serralles. That agreement provided that "[i]f upon completion of the test fill, the area is determined not suitable for final excavation, the Corps of Engineers will then restore the pit to an adequate usable condition for agricultural purposes." After surveying a number of potential sites, ACE concluded that the Serralles clay borrow area would be the best source for clay to be used in the Cerrillos Dam project.

On April 27, 1984 defendant issued a request for proposals for clay to be used in the construction of the Cerrillos Dam. The solicitation contained a special provision stating that "[t]his [supply] contract is contingent on the execution of a land lease agreement between the contractor [ACE] and the Commonwealth of Puerto Rico, Department of Natural Resources (PRDNR), for the lease of property defined in the [contract] specification." The draft form of the land lease was attached as an exhibit to the solicitation. In fulfillment of this condition of the supply contract Serralles and PRDNR executed a land lease agreement on May 18, 1984.

The parties disagree as to who drafted the land lease. Based on the evidence of record, including an ACE memorandum from the Chief of the Real Estate Division, Walter P. Jones III, dated March 19, 1984, it appears that much of the contract language was prepared by ACE and furnished to Serralles and PRDNR for their discussion, modification, and signature. The ACE memorandum contains a sentence reading: "The sponsor [PRDNR] will prepare the actual leasing document for signature by Serralles." PRDNR and Serralles evidently did have some input, as indicated by "mark-ups" deleting paragraph 4.F. and modifying paragraphs 4.G. and 4.H. Thus, it does not appear that the land lease had any one drafter, though ACE clearly had a leading role.

*Land Lease Agreement:* Under this agreement—signed by John Serralles, CEO of Sucesion J. Serralles, Inc., and Hilda Diaz Soltero, Secretary of PRDNR—*Serralles, the Lessor,* leased a 101.5 acre parcel of land (the clay borrow area) to *PRDNR, the Lessee,* "for use by the United States, its representatives, agents, and contractors as a work area" for sourcing clay in "the construction of the Portuguese and Bucana Project." The lease term was set at eight years and was to take effect upon the execution of the Serralles supply contract with ACE. With respect to the terms and conditions of the excavation activities, the land lease provided as follows:

A. Approximately 800,000 cubic yards of material will be extracted.... The first priority of excavation will be from Tract "A" (an area of approximately 70 acres). If adequate material is not available in Tract "A", the remaining material will be excavated from Tract "C" (an area of approximately 7 acres).

B. The borrow area and staging area where material is extracted or accumulated will be left aesthetically dressed.

C. Unsuitable material will be stockpiled orderly in Tract "B", the contractor's staging area [approximately 23 acres].

D. A dike will be placed around the lower portion of the borrow area to control the water outflow .... so that an artificial

lake will be formed. This will be the responsibility of the Army Corps of Engineers.

E. This lease may be terminated by the Lessee [PRDNR] by giving 30 days notice in writing to the Lessor [Serralles] that the United States [has decided it no longer needs the property].

F. [provision deleted]

G. The Lessee [is responsible for ensuring that all necessary permits are secured by the contractor].

H. The Lessee [PRDNR] shall pay the Lessor [Serralles] .... one dollar .... rent .... for an eight year term. The Lessee will be responsible for all property taxes that accrue during the duration of the lease.

I. The Lessee agrees to protect, indemnify, defend and save harmless the Lessor .... against any and all demands, costs, expenses and claims for damage .... which may arise .... [from] the use of the lands herein leased.

*Supply Contract:* Serralles submitted its bid for the supply contract on May 18, 1984, and was awarded the contract by ACE on June 19, 1984. The contract provided that Serralles, for the price of $992,000, was to "furnish to the Government the available Clay Material to be excavated and removed by others from [Tracts A and C in the clay borrow area]." Under the "CHANGES" provision of the contract the contracting officer was authorized at any time to "make changes, within the general scope of this contract," with respect to (1) drawings, designs, or specifications, (2) method of shipment or packing, and (3) place of delivery. "If any such change causes an increase or decrease in the cost of .... the work under this contract .... an equitable adjustment shall be made in the contract price .... Any claim .... for adjustment .... must be asserted within 30 days .... provided, however, that the Contracting Officer, if he decides that the facts justify such action, may receive and act upon [a claim] at any time prior to final payment under this contract." The contract period was defined as ending when all needed clay was excavated or the Cerrillos Dam was completed, "but in no event ....

extending beyond April 1, 1992." The supply contract contained no provision for the "aesthetic dressing" of Serralles' land or any other commitment regarding the post-excavation condition of the land.

On June 26, 1984 Serralles submitted an invoice of $992,000 to ACE for the estimated 800,000 cubic yards of clay material to be excavated and removed from Tracts A and/or C in the clay borrow area for use in the Cerrillos Dam. On July 12, 1984 ACE made payment by issuing a check to Serralles in the amount of $992,000.

*Construction Contract:* On or about September 28, 1984, ACE awarded a contract to Dillingham Construction International (Dillingham) to construct the Cerrillos Dam embankment, spillway and outlet works. The contract provided that Dillingham would begin excavation in Tract A of the Serralles Clay Borrow Area and continue operating there as long as acceptable material was available. If additional clay material was needed, excavation would then move on to Tract C. Dillingham was to stockpile, process, and dispose of waste material within Tract B, with the proviso that "[p]rior to excavation for clay borrow, topsoil shall be removed from the planned excavation area .... The landowner [Serralles] shall be allowed to claim and remove the excavated topsoil," which was to "be spoiled at a location(s) adjacent to Tract B as directed by the contracting officer."

With regard to the post-excavation condition of the Serralles land, Section 6.2.5.3 of the construction contract provided that "areas within the excavation shall be graded and shaped to provide internal drainage and to smooth surface irregularities," and "areas outside of the excavation will be graded as directed by the contracting officer to a near original configuration." The same subsection also provided that "[a]ny part of the perimeter ditch not continuous with the borrow area shall be filled with spoil material." A notice to proceed on the construction contract was issued by ACE to Dillingham on or about October 15, 1984. Dillingham began excavation in the clay borrow area on September 4, 1985.

### Disputes Arise

In a letter to ACE dated August 19, 1995, John Serralles first questioned the placement of material excavated from the clay borrow area. Serralles wrote that "[w]e are talking of the disposition of approximately 80,000 cubic meters of sub-soil and unacceptable material from the pit not including top soil and organic residues." He proposed that ACE deposit this material at three alternative sites outside of the leased property (Tracts A, B and C). The three alternative deposit sites were (1) as additional reinforcement of the dike of Ana Maria No. 5 lake, (2) on a natural depression east of the excavation, and (3) on a natural depression immediately to the east of the excavation. "The top soil and organic material could be left in some pre-agreed corner of the worksite," Serralles suggested.

On August 27, 1985 an ACE engineer, Yamil Castillo, talked to John Serralles by telephone. Mr. Serralles clarified that the 80,000 cubic feet of material referenced in his August 19 letter was the topsoil from the clay borrow area that Dillingham was tasked under the construction contract to stockpile in Tract B. Mr. Castillo explained that ACE could not direct Dillingham to dispose of the topsoil in any of the three alternative sites unless the construction contract between ACE and Dillingham was modified to pay for the additional hauling and compaction of the material. When Dillingham began excavating in the clay borrow area on September 4, 1985, ACE engineer Jose Rosado instructed that the topsoil and other material unsuitable for the dam be deposited in Tract B, the contractor's staging area. On October 4, 1985, in a letter signed by Lt. Col. Stanley Phernambucq, ACE contracting officer for the Dillingham construction contract, ACE formally advised *Serralles* that it declined to adopt the proposal for depositing the "top soil and organic residues" at the three alternative sites.

On October 14, 1985 John Serralles sent another letter to ACE (Lt. Col. Phernambucq) stating that "[w]e have recently been informed that the estimate of unusable material has been reduced considerably. If this is the case and the material mentioned can be uniformly distributed around the lake (the boundaries) that will remain in the leased area; this alternative would also be acceptable to us." The Serralles letter was referred to Mr. Castillo (ACE) who recommended that Serralles' request be approved because it could be done at no additional cost to the Government and would actually require less hauling by Dillingham. ACE replied to Serralles on November 5, 1985, in a letter signed by Lt. Col. Phernambucq, advising that "your request to distribute uniformly the topsoil and unusable material around the lake that will remain within the limits of the leased area has been considered favorably. . . . . [Y]our alternative was found acceptable and within the scope of the Government contract with Dillingham Construction, the firm building the dam."

In response to Serralles' requests to distribute or spread the unusable excavated material, Dillingham had begun in the fall of 1985 spreading some of the topsoil *outside* the clay borrow area limits in an agricultural lot belonging to Serralles immediately south of Tract C. But a Serralles representative telephoned ACE (Mr. Castillo) and directed that no further spreading be done in the subject lot because it might interfere with an underground sprinkler system. The Serralles representative did not suggest any other spreading locations on Serralles property. ACE ceased its spreading operations, as requested, and resumed stockpiling the topsoil and other unusable material from the clay borrow area in Tract B.

The record contains no evidence of any correspondence during the next four years between Serralles and ACE concerning the disposition of unusable material from the excavation site.

On September 14, 1989 a meeting was held between representatives of ACE and Serralles. According to a memorandum of that meeting prepared by Adolfo Moreno (ACE engineer), Miguel Carbonell, President of Serralles, and Juan Vivas, attorney for Serralles, expressed concerns that the terms of the land lease agreement between Serralles and PRDNR were not tied to the supply contract between Serralles and ACE. Carbonell and Vivas indicated that Serralles want-

ed a letter from ACE tying these two contracts together. They were advised to write to Mr. Castillo (ACE) with this request, and were given the vague assurance that they would receive a reply from ACE "assuring them of the obligations of the Government." However, no letter was provided thereafter by ACE to Serralles tying or connecting the land lease agreement to the supply contract.

On December 14, 1989 Serralles (Mr. Carbonell) sent a letter to ACE (Mr. Castillo) raising once again the subject of the disposition of excess material from the excavation site. ACE (engineer George Brunner) replied by letter on February 26, 1990, stating that "[w]e could consider any alternative that could be done at no additional cost to the Government." The letter suggested that Serralles meet with Castillo to discuss the matter.

Dillingham completed the last placement of clay fill for the Cerrillos Dam on August 20, 1990. Over the next three days Dillingham worked on grading and cleaning up the clay borrow area. From August to October 1990, as required by the construction contract, Dillingham used some of the material stockpiled in Tract B to build a levee or dike in the lower portion of Tract A to control the water outflow from the excavation site. This created a 35-acre lake in the clay borrow area. Construction of the Cerrillos Dam was subsequently completed by Dillingham in April 1992.

On August 28, 1990, in a meeting of Serralles, ACE and PRDNR representatives, Mr. Carbonell (President of Serralles) asserted that the stockpiled material in Tract B was supposed to be spread around the levee and in the low areas around the lake in Tract A. Mr. Castillo (ACE) confirmed that the levee would be built with material from the stockpile, but indicated that it was impractical to spread additional unneeded material around it. Mr. Castillo reminded Mr. Carbonell that ACE had tried to accommodate Serralles back in 1985 by spreading some excavated topsoil outside the clay borrow area, but had ceased this activity at Serralles' direction due to the sprinkler system concerns. ACE and Serralles agreed to study the provisions of the land lease agreement,

no copy of which was available at the meeting, and schedule another meeting to continue their discussions on the stockpiled material. Two days later, on August 30, 1990, Serralles faxed to ACE a copy of the November 5, 1985 letter in which ACE indicated it could accommodate Serralles' request to distribute topsoil and unusable material around the lake in Tract A.

The following day, August 31, 1990, Mr. Castillo (ACE) wrote a memorandum reporting on the August 28 meeting of Serralles, ACE and PRDNR, as well as the fax received from Serralles on August 30. In his memo Castillo acknowledged that, despite the approval of Serralles' request in the 1985 letter to spread some of the excavated material:

> "due to an apparent lack of communication, our office [in ACE] was not advised of the agreement. Our recollection .... is that we were consulted on the possibility of accommodating Serralles' request and that we indicated that it could be done at no additional cost to the Government. We were not advised, however, that a final agreement had been reached. At the time, we would have definitely been able to accommodate [Serralles] at no additional costs to the Government. In fact, the spreading of some of the topsoil in a different area could have been done at a lower cost to the contractor since the hauling distance could have been shortened.
>
> The issue at stake now, however, is how to solve the problem..... [A]ny potential solution that implies hauling material from the stockpile will definitely require a change [i.e. upward price adjustment] to the contract with Dillingham [which] has demobilized most of their [sic] earthwork equipment."

The next meeting between Serralles and ACE occurred on September 13, 1990. John Serralles referred again to the November 5, 1985 letter from ACE to Serralles which had evidently not been acted upon or implemented. Mr. Castillo responded that only 80,000 cubic meters of stockpiled material was at issue at the time of the 1985 letter, and he reiterated that Serralles had halted ACE's original attempt to spread the excavated ma-

terial. Messrs. Serralles and Carbonell indicated that the land deemed unsuitable for spreading material was actually farther south than that used by ACE. Both gentlemen acknowledged that there had been a lack of communication on the part of Serralles.

On October 5, 1990 John Serralles sent a letter to ACE (Lt. Col. William Coffey) with a new suggestion. "Rather than .... distributing around the lake the topsoil and unusable material stockpiled in the leased property, .... we suggest that it would be more economical .... to distribute the stockpiled material upon an existing depression in the area immediately adjoining a dirt road on the northeastern boundary of the new lake. This area is close to the stockpiled unusable soil and the soil movement and distribution would be a simpler operation."

ACE (Lt. Col. Coffey) responded by letter dated October 29, 1990, commenting on Serralles' suggestion. The letter stated, in pertinent part, that "we are bound by the contract terms to the extent that any operation calling for the movement of land from parcels (sic) "c" to parcel "b" would be outside the present scope of work and although less expensive than the original proposal, given the present budgetary constraints, would still be impossible to finance at this moment." The letter went on to say that during the following year, "given the projected contracts for the conclusion of the Cerrillos dam project," it was possible "that an option may be found which would permit us to enter into some type of contractual arrangement which would alleviate or correct the present situation."

Serralles (Mr. Carbonell) followed up with a letter to ACE (Lt. Col. Coffey) on August 20, 1991, requesting an update on the budget situation. Coffey responded by letter on September 4, 1991, reiterating "the possibility that the Government could perform work in [the clay borrow area] under future contracts in an effort to alleviate or correct the situation." Coffey encouraged Carbonell to discuss the scope of work required with Mr. Castillo, but also cautioned that "I must emphasize that [ACE] in no way is assuming responsibility for the alleged damages since it is our opinion that we have fully complied

with the contracts between [Serralles and PRDNR] and between [Serralles and ACE]."

During 1992 there was an exchange of correspondence between ACE and PRDNR concerning an extension of the land lease between PRDNR and Serralles. On June 29, 1992 PRDNR (Hilton Miro Detres) wrote to ACE (Adolfo Moreno–Espanol, Chief of the Real Estate Section) advising that the Land Lease "expires in June 1992..... The Corps of Engineers is still working in the area in order to leave the site aesthetically dressed. Please let us know if it is necessary to maintain [the land lease] and if so, how much on [sic] longer do we require it?" In an inter-office memorandum dated August 3, 1992 Mr. Moreno (ACE) referred to the June 29 letter from PRDNR and noted that "[p]reliminary negotiations have already been initiated by [PR]DNR with [Serralles] to extend lease based on unsettled action caused by storage of excess landfill material." The memo indicated that the Virgin Islands government had expressed interest in using the material and was evaluating costs before making a decision. Moreno suggested the "lease be extended for an additional year until the disposal of excess land fill material is resolved."

In a subsequent letter to Mr. Detres (PRDNR), dated December 28, 1992, Mr. Moreno (ACE) requested that the land lease be "extend[ed] for an additional year, until May 1994 ...." [A one-year extension until May 1993 had evidently already been obtained.] Mr. Moreno went on to write that "[t]here is a continued need to have access to this area since there is a stockpile of excess material removed from the clay selection process for the Cerrillos Dam construction..... The owner is requiring that we remove the excess material. The Corps is evaluating possible ways for the removal of some additional amounts of the stockpiled material and to those effects we need the extension of the lease."

Meanwhile, Serralles (Mr. Carbonell) and ACE (Mr. Castillo) had another meeting on October 21, 1992. Carbonell followed up with a letter to Castillo on October 23, restating Serralles' position that ACE had committed in 1985 to distribute the topsoil and

unusable material "uniformly around the lake formed by the excavation." Carbonell closed with a "request [for] specific performance in accordance with the November 5, 1985 letter."

ACE (Lt. Col. Benton) wrote back to John Serralles on January 13, 1993. Benton contested Serralles' assertion that ACE had any contractual obligation with respect to the disposition of material unsuitable for the dam except that it be "stockpiled orderly in Tract B" (quoting Clause B of the land lease agreement). Referring to the letter of November 5, 1985, Benton wrote that "Col. Phernambucq accepted your suggestion of the dispersal of material in an area outside those established in the contract, as part of an effort to remedy the problem of the excess amount of unsuitable material being found. The intent of this agreement was outside the original contract, and was suggested as part of the Corps' effort to assist [Serralles] with this matter." Benton discussed the early deposits of unused materials adjacent to Tract C, discontinued after Serralles voiced concern about its sprinkler system, and ACE's decision thereafter to stick to "its contractual obligations" by depositing all unsuitable material in Tract B. Benton repeated the ACE position "that the Corps did not feel it was contractually obligated to remedy the situation beyond what it was presently doing." Benton closed by advising Serralles "that any remedy must necessarily lie with [PRDNR] under its contract with [Serralles]."

John Serralles responded to ACE (Lt. Col. Benton) on February 12, 1993, observing that "[i]t appears that we have an irreconcilable difference of opinion as to the proper disposal of the stockpile of rejected material...." Serralles again disagreed with ACE's recollection of the sprinkler system episode, asserting that "[w]e asked you to refrain from dispersing the unusable material on a 9 acre plot on the Southwestern part of the new lake, but you were always welcome to spread around the rest of the lake. There was and is more than enough room...."

In 1994 there was a further exchange of correspondence between Roger Sattler, an independent business consultant working with Serralles, and ACE (Lt. Col. Benton).

Mr. Sattler offered his services to try to find a solution to the long-running problem, while Benton restated ACE's position that any contractual claim Serralles might have would be against PRDNR, not ACE.

On January 31, 1995 Luis J. Chardon, an engineer from Coto Laurel, Puerto Rico, produced a memorandum for John Serralles concerning the "Stockpile Ana Maria Farm." According to Mr. Chardon's information, which was gathered at Mr. Serralles' request, 171,169 cubic meters of material was left in the stockpile. The original volume of deposited material was 263,477 cubic meters, but 92,308 cubic meters had been "carried out by others." Chardon, with the help of a quotation from another construction company, estimated the cost to remove and spread the remaining material at $478,417.85. The Government disputes this cost estimate, asserting that the record does not include the purported quote from the construction company nor evidence that the construction company offered to perform the work for that price.

On July 24, 1995 Serralles submitted a "Request for Equitable Adjustment" to ACE in the amount of $478,417.85 (the above cost estimate) based on the failure of ACE to aesthetically dress the unsuitable material extracted from the clay borrow area and stockpiled on Tract B. This request was denied by ACE on September 7, 1995 in a letter citing its long-held position that ACE had no contractual obligation toward Serralles to spread the stockpiled material. The letter also advised "that any possible recourse available to [Serralles] is through the [Puerto Rican] court system against [PRDNR]."

### Onset of Litigation

On January 17, 1996 Serralles submitted a claim for $478,417.85 against ACE under the Contract Disputes Act of 1978 "to compensate Serralles for the Corps of Engineers' failure to aesthetically dress the borrow area and staging area where unused material was extracted or accumulated during the removal of clay material." This claim was denied by the contracting officer in a letter dated February 14, 1996. The contracting officer

based his decision on the following grounds: (1) Serralles' claim is based on a clause contained in the land lease agreement between Serralles and PRDNR, (2) the land lease is not an obligation of the U.S. Government, (3) although the land lease was "incorporated" into the supply contract between Serralles and ACE, the sole purpose thereof was to identify the property and not to create any obligations of the Government, and (4) the supply contract between Serralles and ACE provides no basis for finding the Government liable for losses Serralles suffered as a result of its land lease agreement with PRDNR.

Serralles filed the instant suit in the Court of Federal Claims on March 25, 1996. Both parties filed motions for summary judgment and oral argument was held on December 9, 1997. Thereafter the parties filed a joint status report on December 23, 1997, suggesting that proceedings be suspended until April 1, 1998. In support of that request the parties reported that the appeal in *Cienega Gardens,. et al. v. United States*, 33 Fed.Cl. 196 (1995), 38 Fed.Cl. 64 (1997), had been docketed by the Federal Circuit on August 20, 1997. "Whichever way the court of appeals resolves the contract liability question to be decided in that appeal," the parties indicated, "we anticipate that it will constitute binding precedent upon this Court, and that the opinion may provide some guidance for the issues presented in this case. In addition, the proceedings in *Lurline Gardens Ltd. Housing Partnership v. United States*, 37 Fed.Cl. 415 (1997), have been stayed."

The court complied with the parties' request, issuing a stay of proceedings on January 5, 1998. On December 7, 1998 the Federal Circuit rendered its decision in *Cienega Gardens et al. v. United States*, 162 F.3d 1123, superceded by 194 F.3d 1231 (Fed.Cir. 1998)[2] [cert. denied by *Sherman Park Apts, v. United States*, —— U.S. ——, 120 S.Ct. 62, 145 L.Ed.2d 54 (1999)]. The court then lifted its stay of the instant claim and the parties filed supplemental briefs on the legal effect of the Federal Circuit's opinion on the pending motions for summary judgment. A second round of oral argument was held on April 4, 2000.

## DISCUSSION

■ The issues in this case are primarily ones of contract interpretation, which can be determined by the court as a matter of law. *Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298, 1305 (Fed.Cir.1996). To resolve questions of contract interpretation the court looks first to the plain language of the document(s). *Foley Co. v. United States*, 11 F.3d 1032, 1034 (Fed.Cir.1993). The intention of the parties is gleaned from all of the contract clauses interpreted as a whole, *i.e.*, from the four corners of the document(s). *Dewey Electronics Corp. v. United States*, 803 F.2d 650, 660 (Fed.Cir.1986). If the terms of the contract document(s) are unambiguous, then the court's inquiry is at an end. *Goldsmith v. United States*, 42 Fed.Cl. 664, 668 (1999).

### Timeliness of Plaintiff's Claim

■ In its Answer and Cross–Motion for Summary Judgment, defendant raised the affirmative defense that plaintiff's claim is barred from consideration by this court because the payment of $992,000 by ACE to Serralles in July 1984 constituted a "final payment" of the purchase order which, under the "Changes" clause of the supply contract, terminated plaintiff's right to file a claim. Defendant is mistaken, because the "Changes" clause does not apply to the contract dispute at issue in this claim. The "Changes" clause (Clause 2) of the supply contract provides that:

"The Contracting Officer may at any time, by a written order .... make changes ... in any one or more of the following: (i) *Drawings, designs, or specifications,* .... (ii) *method of shipment or packing;* and (iii) *place of delivery.* If any such change causes an increase or decrease in the cost [or time] of .... performance .... an *equitable adjustment* shall be made in the contract price or delivery schedule, or both .... *Any claim* by the Contractor for adjustment under this clause *must be asserted* within 30 days [of the change notification] .... [though] the Contracting Officer, if he decides that the facts justify such

2. The opinion was republished to correct some inadvertent errors.

action, may receive and act upon [a] claim asserted at any time *prior to final payment* under this contract." (Emphasis added.)

This clause is inapplicable to the case at bar because defendant (ACE) did not make any "changes" to the supply contract with respect to (i) drawings, designs, or specifications, (ii) method of shipment, or (iii) place of delivery. Hence, there was no proper basis for Serralles to assert a claim for equitable adjustment. The issue in the case at bar is whether the Government breached an original contract obligation in failing to "aesthetically dress" Serralles' land and, if so, what amount of money damages is owed Serralles to rectify that breach. As such, the instant claim falls squarely within the purview of the "Disputes" clause (Clause 12) of the supply contract. The "Disputes" clause states that the supply contract is subject to the Contract Disputes Act of 1978, that "*all disputes* arising under or relating to this contract *shall be resolved in accordance with this clause,*" and that the "claims" covered by the clause include demands for "the payment of money, adjustment or interpretation of contract terms, or other relief." (Emphasis added.)

Since there was no "change" in the supply contract that could give rise to an equitable adjustment claim, Serralles was mistaken in seeking such a remedy from ACE in July 1995. In its so-called "Request for Equitable Adjustment" Serralles stated that it was acting "pursuant to the Changes and Disputes Clauses of [the contract]." But in fact no changes to the contract were cited in the letter that could justify a remedy of equitable adjustment. Rather, the claim Serralles asserted ($478,417.85 for the estimated cost of aesthetically dressing the land) was based exclusively on the alleged breach of the original contract. Such a claim could be validly asserted only under the "Disputes" clause. Therefore, the "Changes" clause has no bearing on the contract dispute between Serralles and ACE and the "final payment" provision in that clause is irrelevant to the claim currently before this court.

In sum, plaintiff's action in seeking an "equitable adjustment" in the summer of 1995 was a misguided exercise. The proper course of action was to file an administrative claim with the contracting officer, as provided under the "Disputes" clause. No harm was done, however, because that is exactly what Serralles did six months later, in January 1996. In its letter to ACE requesting a final decision from the contracting officer, Serralles correctly invoked the "Disputes" clause and the Contract Disputes Act as the legal basis for its claim.

■ Under the Contract Disputes Act, moreover, no time limitation was imposed on Serralles for submitting a claim to the contracting officer. From its enactment in 1978 until 1995, "the CDA provided no limitations period in which claims must be presented (or certified) to the CO [contracting officer]." *Board of Governors of University of North Carolina v. United States,* 10 Cl.Ct. 27, 30 (1986). Not until the passage of the 1994 amendments to the Contract Disputes Act was a time period introduced, mandating that contractor claims against the government (as well as government claims against the contractor) "shall be submitted within 6 years after the accrual of the claim." Sec. 2351(a)[(1)] of the Federal Acquisition Streamlining Act of 1994, amending 41 U.S.C. § 605(a), P.L. 103–355, 108 Stat. 3243, 3322, approved October 13, 1994. The 1994 amendments were applicable to contracts awarded on or after October 1, 1995, as specified in implementing regulations issued by the Office of Federal Procurement Policy in September 1995. FAR 33.206(b), 48 C.F.R. § 33.206(b) (1996). The regulations denied retroactive application of the six-year statute of limitations to contracts awarded before October 1, 1995. See *Motorola, Inc. v. West,* 125 F.3d 1470, 1473 (Fed.Cir.1997). Thus, the supply contract ACE awarded to Serralles in 1984 was outside the scope of the 1994 amendments and unaffected by the new six-year limitation period for filing a claim with the contracting officer. The timing of the CDA claim initiated by Serralles in January 1996, therefore, was statutorily sound.

■ Defendant also raises a laches defense, arguing that plaintiff's claim should be barred because its "tardy assertion" has prejudiced the Government. Laches is an

affirmative defense, requiring defendant to prove that (1) plaintiff's delay in litigating its claim was unreasonable and inexcusable and (2) the delay caused defendant to suffer material prejudice or injury. *Nuss v. Office of Personnel Management,* 974 F.2d 1316, 1318 (Fed.Cir.1992); see also *Cornetta v. United States,* 851 F.2d 1372, 1377–1380 (Fed.Cir. 1988). In view of Serralles' extensive and ongoing efforts over the years to reach an accommodation with the Government, the court does not consider its allegedly "tardy assertion" of the instant claim to be unreasonable and inexcusable. The record shows that Serralles first began talking with ACE about the subject matter of this claim in 1985 and that the parties have been in continuous communication about it since 1989. Nor is the court persuaded that the Government has suffered material prejudice or injury by the "delay" in filing suit, considering the abundance of documentation chronicling the dispute. Neither the Assistant District Counsel, who denied plaintiff's request for an equitable adjustment of the contract, nor the contracting officer, who denied plaintiff's administrative claim under the Contract Disputes Act, indicated that the timing of plaintiff's claim was prejudicial to the Government and should be a bar to even considering it. Accordingly, the court finds that defendant has failed to establish the elements of a laches defense. The case will be considered on the merits.

### Are the Supply Contract and the Land Lease an Integrated Contract?

■ The central issue in this claim is whether the supply contract between Serralles and ACE and the land lease agreement between Serralles and PRDNR constitute an integrated contract between ACE and Serralles obligating ACE to perform the "aesthetic dressing" of Serralles' land in accordance with the terms of the land lease. Plaintiff argues that such an integrated contract exists by virtue of the supply contract's incorporation by reference of the terms of the land lease. Defendant argues that the land lease is not part of an integrated contract, but a separate undertaking between Serralles and PRDNR that establishes no contractual obligations for ACE.

The question of whether two or more legal documents, related by a certain commonality in subject matter, parties and/or other factors, constitute a single integrated contract or separate, freestanding contracts is sometimes difficult to determine. As Prof. Williston wrote in his treatise on contract law, "[t]o what extent the various provisions in another connected document should be interpreted as part of the writing in question depends on the facts and circumstances of each case and has given rise to difficult problems of interpretation." 4 *Williston on Contracts,* Sec. 628, p. 910 (1961). While it is "generally true" that "two writings together form one contract," this generalization "is not always accurate, even though the several writings are part of the same bargain." *Id.,* p. 913. For example, "[a] note and a mortgage to secure it are not strictly one contract, though doubtless each is to be interpreted in connection with the other in order to determine its meaning." *Id.,* p. 914. Furthermore, "a contemporaneous writing known to the parties may shed light on the interpretation of a contract without being part of the contract." *Id.*

The other eminent authority on contracts, Prof. Corbin, wrote that "the terms of [a contract] agreement may be expressed in two or more separate documents.... These documents should be interpreted together, each one assisting in determining the meaning intended to be expressed by the others. This is true whether the documents are all executed by a single party or by two or more parties, and whether some of the documents are executed by parties who have no part in executing the others." 3 *Corbin on Contracts,* Sec. 549, pp. 188–190 (1960). "Of course, documents and other circumstances should also be used in this process, so long as they are relevant to the issue, even though they form no part of any so-called "integration" and even though not included within the boundaries of a single transaction." *Id.,* p. 192. Thus, like Williston, Corbin says that documents related or connected to one another can and should be interpreted together to determine their meaning, though the documents in question may not form one integrated contract.

In the case at bar, the supply contract and the land lease were "part of the same bargain" insofar as execution of the land lease by Serralles and PRDNR was a condition precedent to the award and performance of the supply contract between Serralles and ACE. However, the court is not persuaded that these two documents should be interpreted as a single integrated contract. It is important to note that the two contracts were signed by separate sovereign authorities (the supply contract by the United States, acting through the Army Corps of Engineers, and the land lease by the Commonwealth of Puerto Rico, Department of Natural Resources) each with separate and distinct responsibilities. The distinct responsibilities of the two sovereigns were defined in the underlying legislation (Rivers and Harbors Flood Control Act of 1970) for the Portuguese and Bucana River flood control projects, and in the Local Cooperative Agreements signed by the United States and Puerto Rico in 1974 and 1981, *supra.* The United States, or its contractors, were responsible for providing the funding and carrying out the construction projects, while Puerto Rico was responsible for securing access to the project area(s) and protecting the United States from all damages claims, except those due to the fault or negligence of the United States or its contractors. Thus, the undertakings required of the United States and Puerto Rico in the Portuguese and Bucana River projects were separate and distinct.

These separate and distinct undertakings of the United States and Puerto Rico were clearly set forth in the supply contract between Serralles and ACE and the land lease agreement between Serralles and PRDNR. ACE contracted to excavate clay material from Serralles' land for use in the Cerrillos Dam, while PRDNR contracted to lease Serralles' land, secure unrestricted access by ACE, and obtain all necessary permits. The separate and distinct nature of the undertakings by ACE and PRDNR is also reflected by the separate and distinct consideration in the two contracts. In the supply contract ACE paid Serralles $992,000 for the 800,000 cubic yards of clay material estimated to be needed for the dam. In the land lease

PRDNR (in addition to paying Serralles nominal rent of one dollar) assumed responsibility for all real property taxes accruing during the lease term. In addition, PRDNR undertook to leave Serralles' land "aesthetically dressed" and to indemnify Serralles for any damages which may arise from the excavation and related activities on the land. Thus, the supply contract and the land lease had different parties, different purposes, and different consideration—evidence that the parties intended to make two contracts, not one. *In re Gardinier, Inc.,* 831 F.2d 974, 976 (11th Cir.1987).

### Does the Supply Contract Incorporate the Terms of the Land Lease?

In the case at bar, Serralles asserts that its supply contract with ACE incorporates its land lease with PRDNR (including the "aesthetic dressing" requirement therein) because the supply contract contains provisions which (a) specifically reference the land lease, (b) make performance of the supply contract contingent on the execution of the land lease, and (c) include a draft of the land lease as an attachment. In particular, Section H of the supply contract ("Special Provisions") states that "[t]his contract is contingent on the execution of a land lease agreement between [Serralles] and [PRDNR], for lease of property defined in the specification, Section C, and drawings, Section J, of this contract and more specifically defined in land lease agreement draft copy, Figure 3, Section J of this contract." Section J of the supply contract ("List of Documents, Exhibits, and Other Attachments") includes the land lease as an attachment (Figure 3).

 "Incorporation by reference" requires a reference in one document to the terms of another. Moreover, the incorporating document must not only refer to the incorporated document, it must bring the terms of the incorporated document into itself as if fully set out. *Firth Construction Co., Inc. v. United States,* 36 Fed.Cl. 268, 275 (1996). Nothing in the above referenced provisions of the supply contract between ACE and Serralles, however, serves to incorporate the specific terms of the land lease between

Serralles and PRDNR. Most importantly, there is no language whatsoever in the supply contract which refers to any "aesthetic dressing" requirement for Serralles' land or which purports to incorporate the "aesthetic dressing" provision of the land lease. Making the performance of the supply contract contingent on the prior execution of a land lease and attaching a draft copy of the land lease to the contract solicitation certainly establishes the close interrelationship of the two contracts. But it does not satisfy the legal requirements for incorporating the terms of the land lease into the supply contract.

As an additional argument that the land lease is an integral part of the supply contract, Serralles alleges that the land lease could be terminated by the defendant on 30 days notice. This argument, however, is based on a misreading of the land lease. The pertinent provision in that document states that "[t]his lease may be terminated by the *Lessee* [*PRDNR* ] by giving 30 days notice to [Serralles] that the United States has determined that the Property is no longer needed." In other words, only PRDNR, Serralles' contracting partner in the land lease, can give notice of termination. The United States [ACE] would simply advise PRDNR beforehand that it does not need any more clay material from the property.

Plaintiff also argues that the land lease is an integral part of the supply contract because it contains multiple obligations running to Serralles that are defendant's responsibility to fulfill. According to Serralles, these obligations are set forth in the following clauses of the land lease:

"4.B. The borrow area and staging area where material is extracted or accumulated will be left aesthetically dressed.

4.C. Unsuitable material will be stockpiled orderly in Tract "B", the contractor's staging area.

4.D. A dike will be placed around the lower portion of the borrow area to control the water outflow. The said dike or dam will be adequate to withstand the pressure from the water that will be accumulated behind it so that an artifi-

cial lake will be formed by the water stored behind the dike or dam. *This will be the responsibility of the Army Corps of Engineers.*" (Emphasis added.)

Serralles alleges that the underlined sentence creates an ambiguity because it is unclear whether "This" at the beginning of the sentence refers to all three obligations or only the last. However, since the responsibility of ACE for building the dike is specifically acknowledged in Clause 4.D. of the land lease, and ACE has in fact fulfilled the obligation in Clause 4.C. to stockpile unusable material in Tract B despite the absence of a sentence ascribing this responsibility to ACE, Serralles argues that "defendant should also be obligated [under Clause 4.B.] to 'aesthetically dress' the unusable material." Under the rule of *Contra Proferentem*, any ambiguity should be interpreted against defendant because, according to Serralles, the land lease was drafted by ACE. *North Star Alaska Housing Corp. v. United States*, 30 Fed.Cl. 259, 285 (1993); *United States v. Turner Construction Co.*, 819 F.2d 283, 286 (Fed.Cir.1987).

Plaintiff's argument under the rule of *Contra Proferentem* rests on three assumptions: (1) that ACE drafted the land lease, (2) that the land lease established a contract between ACE and Serralles, and (3) that the land lease is ambiguous. As previously discussed, the parties do not agree as to who drafted the land lease more than a decade and a half ago. From the evidence of record, including an ACE internal memorandum of March 19, 1984 containing some draft language that later appeared in the land lease, it appears that much of the contract language was provided by ACE. The ACE memorandum also states, however, that PRDNR "will prepare the actual leasing document for signature by Serralles." PRDNR and Serralles had at least some input, as evidenced by "mark-ups" deleting paragraph 4.F. and modifying paragraphs 4.G. and 4.H. Thus, it does not appear that the land lease has one single drafter, though the court is persuaded that ACE played a leading role in drafting the document's language.

■ The court does not accept plaintiff's contention that ACE is a party to the land lease, however, just because of its primary role in drafting the subject document. The fact that the Government is involved in the preparation of a contract document between two non-federal parties does not *ipso facto* make the Government a party to that contract. The Government can, as a condition of providing federal assistance (by separate agreement) to one or both of the parties, require that their contract conform to certain standards, follow a particular format, include certain terms, and/or be approved by the responsible federal agency without thereby waiving the Government's sovereign immunity and establishing privity of contract between the Government and either non-federal party with respect to the terms of that contract. *Smalley v. United States,* 178 Ct. Cl. 593, 372 F.2d 505, 507–508 (1967); *Housing Corporation of America v. United States,* 199 Ct.Cl. 705, 468 F.2d 922, 923–924 (1972).

Even if the court were to grant, arguendo, that ACE was a party to the land lease and was its primary drafter, this would only mean that any ambiguities therein must be construed against ACE. While Clause 4.D. does cite ACE as responsible for building the dike, Clause 4.B. contains no such citation with respect to "aesthetic dressing." There is no rational or legal basis to infer from the additional sentence in Clause 4.D., reciting ACE's responsibility for building a dike, that it is also responsible under Clause 4.B. for the "aesthetic dressing" of Serralles' land. Had ACE intended to assume a similar responsibility with respect to "aesthetic dressing" as it did with respect to building the dike, it could have included or consented to the additional sentence in Clause 4.B. which

appeared in Clause 4.D. Moreover, ACE's original contract with Serralles in 1980 (for the excavation of a test pit) did include an "aesthetic dressing"-type provision which required ACE, should the land not be used to supply clay for the dam, to "restore the pit to an adequate usable condition for agricultural purposes." So ACE and Serralles each knew how to contract for "aesthetic dressing" if that were their mutual intent.

Moreover, if Serralles and PRDNR believed that ACE had a responsibility for "aesthetic dressing" like it did for building the dike, they could have used the opportunity prior to signing the land lease in the spring of 1984 to correct this "oversight" in the draft language with an appropriate "mark-up" of Clause 4.B. The land lease does bear evidence of certain "mark-ups" by Serralles and PRDNR in Clauses 4.F., 4.G. and 4.H.—but none in Clause 4.B. As the language stands, Clause 4.B. contains no reference to ACE and the "aesthetic dressing" referenced therein can only be interpreted as a responsibility of Serralles' contracting partner in the land lease, PRDNR.[3]

Accordingly, the court is not persuaded by plaintiff's argument that the land lease contains any ambiguities which must be interpreted against ACE. The signatories of the land lease are Serralles and PRDNR. The "aesthetic dressing" requirement set forth in Clause 4.B. of the agreement, therefore, is an agreement between Serralles and PRDNR, not ACE.[4]

### *Does Defendant's Course of Conduct Evidence Contractual Obligation?*

■ Plaintiff argues that defendant's course of conduct through the years is evi-

---

3. The stockpiling of unusable material in Tract B (referenced in Clause 4.C. of the land lease) was performed by Dillingham in accordance with the construction contract (which contained a similar provision). Failure to perform on this contract would give ACE a right of action against Dillingham. But it would not give Serralles a right of action against ACE or Dillingham because Serralles is not a party to the construction contract. Serralles' right of action under Clause 4.C. of the land lease would be against the other signatory of that document, PRDNR, which contracted in the land lease to "indemnify" Serralles for "claims for damage" arising from "the use of the lands."

4. Even if the court were to accept plaintiff's argument that the supply contract and the land lease are an integrated contract, the court does not find that this would establish ACE's responsibility for the "aesthetic dressing" of Serralles' land. There would still be two instruments here with different parties, different consideration, and different performance required by ACE and PRDNR. "Aesthetic dressing" would be no more a responsibility of ACE under the land lease than would the payment of $992,000 to Serralles for the clay material be a responsibility of PRDNR under the supply contract.

dence of its acknowledgement that ACE had a contractual obligation to "aesthetically dress" Serralles' land. The conduct of the parties before a controversy arises is of great weight in interpreting the contract. *General Warehouse Two, Inc. v. United States*, 181 Ct.Cl. 180, 389 F.2d 1016, 1020 (1967), *Blinderman Construction Company v. United States*, 695 F.2d 552, 558 (Fed.Cir.1982). Plaintiff points to the letter from ACE to Serralles on November 5, 1985 as the first acknowledgement by ACE of its obligation for the "aesthetic dressing" of Serralles' land. That letter stated that "your request to distribute uniformly the topsoil and unusable material around the lake .... was found acceptable and *within the scope of the Government contract with Dillingham Construction...*" (emphasis added). The crucial part of this correspondence is the underlined language, which clearly states that the soil distribution contemplated by ACE was only that which could be accomplished within the bounds of the ACE construction contract with Dillingham (*i.e.*, at no additional cost to the Government). Nothing in this "request" from Serralles indicates that ACE was contractually bound to fulfill it.

Plaintiff next cites the ACE internal memorandum of August 31, 1990, which refers to the letter of November 5, 1985, and admits that "due to an apparent lack of communication, our office [in ACE] was not advised of the agreement [to spread unusable soil around the lake]." The 1990 memorandum did not talk about any contractual obligation of ACE toward Serralles to distribute the soil, but rather about how "[a]t that time [1985], we would have definitely been able to accommodate [Serralles'] request at no additional costs to the Government. In fact, the spreading [operation] could have been done at a *lower cost to the contractor* [Dillingham] since the hauling distance could have been shortened." (Emphasis added.) By 1990, however, "any potential solution that implies hauling material from the stockpile will definitely require a change to the contract with Dillingham." Thus, once again ACE stressed that any accommodation of Serralles' "aesthetic dressing" request was being contemplated within the scope of its construction contract with Dillingham, not as

any contractual obligation (in the supply contract or the land lease) running to Serralles.

Plaintiff cites three additional communications from ACE to Serralles, dated October 29, 1990, January 13, 1993, and September 7, 1995, allegedly confirming that ACE had acknowledged a contractual obligation to perform the "aesthetic dressing" of Serralles' land. These three documents, however, do not sustain plaintiff's argument. As discussed earlier, they all refer to the attempt made by ACE in 1985 to accommodate Serralles' request to dispose of approximately 80,000 cubic meters of unusable material (the estimated accumulation at that time) by having Dillingham deposit it in an area on Serralles' land just outside the clay borrow area (to the south of Tract C). Serralles asked that this operation be stopped because it endangered a sprinkler system it had installed in the area. ACE complied with Serralles' request and had its contractor, Dillingham, resume the stockpiling of unusable material in Tract B, as provided under the construction contract. Nothing in this correspondence evidences any contractual obligation of ACE for the "aesthetic dressing" of the subject land. It is simply additional evidence that ACE tried to help Serralles, as much as it could within the parameters of its contract with Dillingham, to get rid of unusable material from the excavation.

Other documentation in the record confirms that ACE's communication with Serralles over the years consistently emphasized that it was trying to assist Serralles in the distribution of soil on its land as much as it could within the bounds of the ACE construction contract with Dillingham, but that it was not contractually obligated under the land lease for the "aesthetic dressing" of Serralles' land. As early as August 1985 ACE (Mr. Castillo) advised John Serralles that it could not have Dillingham dispose of soil in the three alternative sites originally proposed by Serralles without modifying the construction contract to pay Dillingham for the additional cost. On February 26, 1990 ACE (Mr. Brunner) wrote Serralles (Mr. Carbonell) that any alternative could be considered that would not involve additional cost to the Government. The same message was

conveyed by Mr. Castillo in his meeting with Serralles and PRDNR representatives on August 28, 1990. On September 4, 1991 ACE (Lt. Col. Coffey) wrote to Serralles (Mr. Carbonell) of the possibility that the soil distribution work could be done in the context of future contracts, but also reminded him that ACE was assuming no responsibility for the alleged damages. On May 4, 1994 ACE (Lt. Col. Benton) wrote to Serralles consultant Roger Sattler reiterating that ACE had no legal liability for the post-excavation condition of Serralles' land, and that any claim Serralles might have should be addressed to PRDNR.

Based on the foregoing analysis, the court finds that defendant's course of conduct from the time that performance on the supply contract began in 1985 up to the commencement of the current litigation manifests a consistent position that the Government has no contractual obligation to "aesthetically dress" plaintiff's land within the meaning of the land lease agreement.[5] On numerous occasions, moreover, defendant advised plaintiff that any claim it might have would be against PRDNR, its contracting partner in the land lease. There is no evidence in the record that Serralles has heeded this advice and taken any legal action in that direction.

The court also notes that Serralles was not as diligent as it could have been in pursuing the opportunity to work with ACE to distribute the excavated material within the parameters of the Dillingham contract. As previously discussed, ACE began spreading some soil in 1985 but was halted by Serralles because the distribution site endangered Serralles' sprinkler system. Then after agreement was tentatively reached with ACE in November 1985 to spread material around the lake in Tract A, Serralles apparently failed to monitor the situation for the next four years. During this time ACE did not implement the agreement due to an administrative foul-up. Considering ACE's stance from 1985 on that it had no contractual obli-

gation to "aesthetically dress" the land, but was trying to accommodate Serralles as far as it could within the Dillingham contract, it strikes the court that Serralles should have taken better advantage of the opportunity by maintaining constant contact with ACE. But Serralles let the situation slide. Not until December 1989, according to the evidence of record, did Serralles again broach the subject of spreading the excavated material with ACE, by which time an enormous amount of material had been stockpiled in Tract B. In their meeting with ACE on September 13, 1990, Serralles (Messrs. Serralles and Carbonell) acknowledged that there had been a lack of communication on their part.

### Cienega Gardens precedent

As previously discussed, the court suspended this case for a year, at the parties' mutual request, pending the Federal Circuit's disposition of the *Cienega Gardens* case on appeal from the Court of Federal Claims. That case presented similar issues of contract interpretation involving multiple parties and documents. *Cienega Gardens* involved contracts arising out of a federal program that began in the 1950s and '60s to encourage private developers to build and manage low-income housing. The Department of Housing and Urban Development (HUD) provided mortgage insurance to project developers (owners), which enabled them to get low-interest mortgages from private lending institutions (lenders).

Owners obtained HUD-insured mortgages by executing deed of trust notes payable to the lenders. These instruments were printed on forms approved by HUD, which also endorsed the notes as part of its mortgage insurance. The repayment terms of the deed of trust notes were generally 40 years, but riders to the notes permitted repayment of the loans in full after 20 years. In exchange for HUD's insurance endorsement owners entered into regulatory agreements with HUD which placed certain affordability re-

---

**5.** As previously discussed, Dillingham did perform some post-excavation grading of the clay borrow area in accordance with the contractor's obligations to ACE under the construction contract. According to the evidence of record, which includes several photographs of the sub-

ject land, the spoil area of Tract B currently contains two piles of earth that are covered with vegetation native to the region. Defendant describes the excavated material as "graded and shaped" and "aesthetically dressed to the extent the configuration of the land allows."

strictions on their housing, such as rent controls, tenant income levels, and profit rates. The regulatory agreements were to remain in effect until the HUD-insured loans were repaid to the lenders. The regulatory agreements made no mention of a right to prepay the loans, though HUD regulations permitted owners to prepay their loans after 20 years.

In 1988 and 1990 two federal laws were enacted that suspended and then established a permanent moratorium on the hitherto automatic right of owners to prepay HUD-insured mortgages after 20 years. Prepayment was made subject to approval by HUD. These laws reflected concerns by Congress that a flood of prepayments by owners opting to get out from under the "affordability restrictions" on their properties might drastically reduce the availability of low-income housing. Therefore, owners were prevented from prematurely terminating their regulatory agreements with HUD and converting their properties into conventional "market rate" rental housing.

In 1994 several dozen owners filed suit in the Court of Federal Claims, alleging that the new laws breached their contracts with HUD by taking away the right to prepay their mortgages after 20 years. The government argued there was no privity of contract between HUD and the owners with respect to the 20-year prepayment provision because HUD was not a party to the deed of trust notes between the owners and the lenders and HUD's regulatory agreements with the owners did not include any such provision. The court held for plaintiffs in 1995, finding that "when the [owners and HUD] entered into the regulatory agreement they also intended to be mutually bound by the prepayment rules [in the rider to the] deed of trust note," thus satisfying the requirements of privity. *Cienega Gardens, et al. v. United States,* 33 Fed.Cl. at 210 (1995).

In a similar case decided two years later, however, the Court of Federal Claims went the other way. *Lurline Gardens Limited Housing Partnership v. United States,* 37 Fed.Cl. 415 (1997). This case was also filed by a group of low-income housing owners in the HUD program claiming breach of contract by the Government based on the termination of the 20–year prepayment rights on their mortgage loans. In *Lurline Gardens* the court held that there was no privity of contract between the owners and HUD with respect to the prepayment rights.

"This court is not persuaded by Cienega Gardens on the question of whether the notes and deeds bind the government . . . . The principle that writings are to be interpreted together merely ensures that the transaction as a whole be properly and consistently understood, not that all the obligations of a party to one writing be ascribed to all the parties to every other writing. *Lurline Gardens,* 37 Fed.Cl. at 420

. . . . [T]here simply is no contract between the plaintiffs and [HUD] in which [HUD] agreed to permit prepayment after twenty years, and the court shall not infer such a contract from agreements that easily could have been, but were not, written to include such an obligation. That the RA [regulatory agreement] and mortgage note should be read together or consistently as part of a concurrent transaction does not mean that an obligation in the latter should be incorporated into the former." *Id.* at 421

The *Lurline Gardens* ruling was followed by the Court of Federal Claims a year later in *Greenbrier (Lake County Trust Company No. 1391), et al. v. United States,* 40 Fed.Cl. 689 (1998). In that case the court held that "[p]laintiffs did not secure a contract right from defendant to prepay their government-insured mortgages after 20 years as neither the relevant documents, nor the context of their execution, indicate that such a right was secured. While HUD had a contract of insurance with the private lenders to insure plaintiffs' mortgages, HUD was not a party on the notes containing the prepayment term . . . . and the regulatory agreement between HUD and plaintiffs did not incorporate the terms of the note." *Greenbrier,* 40 Fed.Cl. at 691.

The conflict in these opinions was resolved in late 1998 when the Federal Circuit reversed the Court of Federal Claims in *Cienega Gardens.* In its ruling the Federal Circuit held that:

"While the deed of trust note .... and the regulatory agreement were part of the same transaction, each document stands alone and is unambiguous on its face. The documents evidence separate agreements between distinct parties..... The regulatory agreement .... did not address prepayment, and the [Court of Federal Claims] erroneously read the prepayment terms contained in the deed of trust note and Rider A, between the private lending institutions and the relevant Owner, into the regulatory agreement between HUD and the owner. The critical point is that the contract documents simply do not show privity of contract between the Owners and HUD with respect to a right to prepay the mortgage loans after twenty years without HUD approval." *Cienega Gardens, et al. v. United States,* 194 F.3d 1231, 1243 (Fed.Cir.1998).

Consistent with its ruling in *Cienega Gardens,* the Federal Circuit has recently affirmed the Court of Federal Claims in *Greenbrier, et al. v. United States,* 193 F.3d 1348 (1999). In this opinion the Federal Circuit held that "[o]ur holding in Cienega Gardens is dispositive of the issue concerning whether the Owners in this case were in privity of contract with the government with respect to the prepayment terms found in their mortgage notes..... [W]e affirm the trial court's determination that the United States was not in privity of contract with the Owners" and "is therefore not liable for breach of such contracts." *Greenbrier,* 193 F.3d at 1355.

Defendant argues that the Federal Circuit's opinions in *Cienega Gardens* and *Greenbrier* represent binding precedent for this court in the case at bar. The factual situation presented by the instant case is similar in that the statement in the land lease, signed by Serralles and PRDNR, that "the borrow area and staging area where material is extracted or accumulated will be left aesthetically dressed" is not a contractual promise by ACE to Serralles. Thus, Serralles is not in privity of contract with ACE regarding the terms of the land lease, just as the property owners in *Cienega Gardens* and *Greenbrier* were not in privity of contract with HUD regarding the prepayment terms

of the mortgage notes signed by the owners and the lenders. Moreover, the supply contract between Serralles and ACE contains no promise by ACE to leave the land "aesthetically dressed," or any other provision regarding the post-excavation condition of the land, just as the regulatory agreements between HUD and the owners in *Cienega Gardens* and *Greenbrier* contained no provision on the subject of prepaying loans.

In *Cienega Gardens,* the regulatory agreements signed by HUD and the owners made reference to the deed of trust notes between the owners and the lenders, which were endorsed for insurance by HUD. The notes, which included attached riders allowing prepayment after 20 years, incorporated the regulatory agreements by reference. But the Federal Circuit ruled that this did not make HUD a party to the deeds of trust and did not serve to incorporate the prepayment provisions of the deed of trust notes into the regulatory agreements. Similarly, in the case at bar the supply contract between Serralles and ACE makes reference to the land lease in several places. Section H of the supply contract states that "[t]his contract is contingent on the execution of a land lease agreement between [Serralles] and [PRDNR]" and Section J of the supply contract ("List of Documents, Exhibits, and Other Attachments") includes the land lease as an attachment. But these references do not serve to incorporate the specific provisions of the land lease, including the "aesthetic dressing" provision, into the supply contract because they do not bring the specific terms of the land lease into the supply contract. *Firth Construction Company,* 36 Fed.Cl. at 275, *supra.*

Plaintiff argues that the Federal Circuit's ruling in *Cienega Gardens* is distinguishable from the case at bar on three grounds. While the court's ruling in Cienega Gardens was based on findings that (1) the regulatory agreement did not incorporate any other agreement, (2) the only document that addressed prepayment was the deed of trust note, and (3) each document stands alone, plaintiff contends that (1) the supply contract incorporates the terms of the land lease in at least three instances, (2) both documents de-

scribe the duty to "aesthetically dress" Serralles' property, and (3) the two documents cannot stand alone. As evidence of (1)—the incorporation of the land lease into the supply contract—plaintiff cites (a) Section H of the supply contract, which states that it is contingent on the execution of the land lease, (b) Section J of the supply contract which attaches the land lease thereto, and (c) the power of defendant to cancel the land lease on 30 days notice. As for (2), plaintiff asserts that the "aesthetic dressing" provision in the supply contract is furnished by the land lease's incorporation into that document. As for (3), plaintiff contends that the land lease has no meaning separate and apart from the supply contract because it existed solely to facilitate performance of the supply contract and cannot be viewed as "standing alone" from it since at least one obligation of ACE is specifically identified therein.

This court is not persuaded by plaintiff's arguments on the distinctions between the case at bar and *Cienega Gardens*. As previously discussed, the supply contract did not incorporate the terms of the land lease (and its "aesthetic dressing" provision), as required to support a legal finding that these documents constitute an integrated contract, and only PRDNR, not defendant, had the power to cancel the land lease on 30 days notice. Moreover, as in *Cienega Gardens*, the parties to the subject contracts are not the same and the consideration in the two contracts is different. Though the supply contract and the land lease relate to a common enterprise—the construction of the Cerrillos Dam—the undertakings of the parties and their rights and liabilities toward one

another are different in the respective contracts. In other words, though the supply contract and the land lease at issue here "were part of the same transaction," like the regulatory agreement and the deed of trust note in *Cienega Gardens*, "each document stands alone and is unambiguous on its face. The documents evidence separate agreements between distinct parties." *Cienega Gardens*, 194 F.3d at 1243.

In accordance with the Federal Circuit's ruling in the above case, the court finds in the case at bar that the supply contract did not incorporate the land lease or any provisions thereof. The two documents stand alone as separate and distinct contracts. The only agreement with an "aesthetic dressing" provision is the land lease, an agreement between Serralles and PRDNR. The supply contract between Serralles and ACE contains no "aesthetic dressing" provision. Thus, Serralles is not in privity of contract with ACE with respect to the "aesthetic dressing" of Serralles' land. If Serralles has any remedy for the "aesthetic dressing" of its land, it must be pursued against PRDNR, not against ACE.[6]

### CONCLUSION

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. U.S. Court of Federal Claims Rule 56(c); *Schuerman v. United States*, 30 Fed.Cl. 420, 434 (1994). In the case at bar the court has determined that plaintiff is not in privity of contract with defendant with respect to the "aesthetic

---

**6.** Plaintiff argues that if defendant did not have a contractual obligation to plaintiff to "aesthetically dress" its land, then it stands in violation 31 U.S.C. § 1301, which provides that "[a]ppropriations shall be applied only to the objects for which the appropriations were made," and of the Anti–Deficiency Act, 31 U.S.C. § 1341(a), which prohibits government officials from expending any federal funds in excess of the dollars appropriated by Congress. Applying this law to the case at bar, plaintiff contends that Dillingham's obligations under the construction contract to (1) stockpile unsuitable material in Tract B, (2) build a dike in Tract A upon completion of the excavation work, and (3) grade the area upon completion of the work "to a near original configuration"—tasks which closely track obligations set

forth in the land lease—could be paid from appropriated funds only if this work was "necessary" to the completion of the "project." Since Dillingham was being paid with appropriated funds, the above work must have been "necessary" to the "project" and therefore a legal obligation of defendant's toward plaintiff. The court does not agree with plaintiff's rationale. The point is that the federal expenditures on the above tasks were pursuant to the construction contract between ACE and Dillingham, not the land lease between Serralles and PRDNR. Plaintiff has not demonstrated that any of the cited tasks in the construction contract was outside the scope of the project (the building of the Cerrillos dam) for which the subject federal funds were appropriated.

dressing" of plaintiff's land. As a matter of law, therefore, plaintiff's claim for breach of contract cannot be sustained, and defendant is entitled to summary judgment.

Accordingly, plaintiff's motion for summary judgment is hereby denied. Defendant's cross-motion for summary judgment is granted. The Clerk of the Court is ordered to enter judgment for defendant and dismiss the claim. No costs.